## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NIAGARA PRESERVATION COALITION, INC.,
345 Buffalo Avenue
Niagara Falls, New York 14303
(716) 534-1957

                Plaintiff,

    v.

FEDERAL ENERGY REGULATORY COMMISSION,
888 1st St N.E.
Washington, DC 20426
(202) 502-8200,

JON WELLINGHOFF, in his official capacity as
Chairman, Federal Energy Regulatory Commission,
888 1st St N.E.
Washington, DC 20426
(202) 502-8200,

NATIONAL PARK SERVICE,
1849 C Street, N.W.
Washington, DC 20240
(202) 208-3818,

JON JARVIS, in his official capacity as
Director, National Park Service,
1849 C Street, N.W.
Washington, DC 20240
(202) 208-3818,

UNITED STATES ARMY CORPS OF ENGINEERS,
441 G St N.W.,
Washington, DC 20314-1000
(202) 761-0010, and

LIEUTENANT GENERAL THOMAS P. BOSTICK, in
his official capacity as Commanding General and Chief of
Engineers, United States Army Corps of Engineers,
441 G St N.W.,
Washington, DC 20314-1000
(202) 761-0010,

                Defendants.

Civil Action No.  13-1015

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Niagara Preservation Coalition, Inc. ("Plaintiff" or the "Coalition") alleges as follows:

**INTRODUCTION**

1.      In this action, Plaintiff complains of the approvals, permits and determinations (collectively, the "Approvals") granted, made, not granted or not made by the Defendants which illegally allowed a private company to construct a private industrial facility (the "Project") within the Niagara Falls National Heritage Area and Niagara Reservation State Park (the "Park") for the purpose of allowing the storage, maintenance, and refueling of privately owned tour boats.  The Project will result in the imminent destruction or elimination of all or part of the historic Schoellkopf Power Plant (the "Power Plant Site"), which is listed on the National Register of Historic Places, and will also have significant environmental impacts.

2.      In rushing to approve the Project, which is also subject to the conditions of FERC License No. 2216 ("FERC License"), defendants Federal Energy Regulatory Commission ("FERC"), National Park Service ("NPS"), and United States Army Corps of Engineers ("USACE") (collectively the "Federal Agencies") blatantly failed to comply with the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §4321 *et seq.*, the Land and Water Conservation Fund Act of 1965 ("LWCF"), 16 U.S.C. §460l-8, the National Historic Preservation Act of 1966 ("NHPA"),16 U.S.C. §470 *et seq.*, Section 404 of the Clean Water Act, 33 U.S.C. §1344, and the River and Harbors Act of 1890, 33 U.S.C. §403.  In addition, FERC arbitrarily and capriciously authorized the New York Power Authority ("NYPA") to grant a land use permit to Maid of the Mist Corporation for the Project in clear

violation of the FERC License to operate the Niagara Power Project (the "Power Project") in Niagara County, New York.  Among other things, FERC utterly failed to comply with the Historic Property Management Plan (the "HPMP") for the Power Project, and other laws, regulations, and procedures as may further be determined.

3.     The driving force behind the rushed and illegal actions of the Defendants was the State of New York's strong proprietary desire to hurriedly facilitate the operations of a private concession operator, Maid of the Mist Corporation ("MOTM"), which is no excuse for the total disregard of applicable federal environmental and historic preservation laws.

4.     In this action, Plaintiff seeks:

a.     An order declaring that the Approvals by the Defendants were arbitrary, capricious, an abuse of discretion and contrary to law in violation of the Administrative Procedures Act ("APA") for failure to comply with the requirements of NEPA, the NHPA, the LWCF, the FERC License, the Clean Water Act and/or the River and Harbors Act of 1890;

b.     An order compelling FERC and USACE to conduct a NEPA analysis consistent with statutory requirements that includes an environmental assessment and an environmental impact statement with an alternatives analysis because the Project represents a major federal action that adversely impacts a site of historic and cultural significance;

c.     An order declaring that the Project has resulted in an illegal conversion of parkland that had been funded pursuant to the LCWF, and that this Project cannot continue until and unless it complies with the requirements of the LWCF;

> d.  An order annulling the Approvals given to NYPA and MOTM by the Defendants for the Project, without which the Project cannot legally move forward; and
>
> e.  Such further relief this court deems just, proper and equitable.

## PARTIES AND INVOLVED ENTITIES

5.  The Coalition is a not-for-profit corporation organized under New York Not-for-Profit Corporation Law with a mission to preserve and protect the environmental and historical character of the Niagara Falls National Heritage Area, Niagara Falls State Park, the Niagara River Gorge (the "Gorge"), other waterfront properties in the "high banks" and other industrial areas within Niagara County.  The Coalition also promotes the civic betterment and social welfare of the community by informing the public on environmental issues and ensuring compliance with land use, zoning and environmental laws, codes and regulations.

6.  Defendant FERC is a federal agency with authority for licensing hydropower facilities, including the FERC License for the Power Project.  FERC has its headquarters at 888 First Street, N.E., Washington, D.C.  20406.

7.  Defendant JON WELLINGHOFF is the Chairman of FERC.  Mr. Wellinghoff's offices are at 888 First Street, N.E., Washington, D.C.  20406.

8.  Defendant NPS is the federal parks agency with responsibility for oversight of the NHPA and the expenditure of funds pursuant to the LWCF.  NPS has its headquarters at 1849 C Street, N.W., Washington, D.C.  20240.

9.  Defendant JON JARVIS is Director of NPS.  Mr. Jarvis's office is located at NPS's headquarters at 1849 C Street, N.W., Washington, D.C.  20240.

10.     Defendant USACE is the federal agency with responsibility for the issuance of permits for the construction of structures, dredging, and filling in federal navigable waterways pursuant to River and Harbors Act of 1890 and the Clean Water Act.  USACE's headquarters are at 441 G Street NW, Washington, DC 20314-1000.

11.     LIEUTENANT GENERAL THOMAS P. BOSTICK is the Commanding General and Chief of Engineers, United States Army Corps of Engineers.  Lt. Gen. Bostick's offices are at 441 G Street NW, Washington, DC 20314-1000.

12.     Involved entity NYPA is a public authority of the State of New York created pursuant to Article 5 of New York Public Authorities Law.

13.     Upon information and belief, NYPA is the owner of the Power Plant Site.

14.     NYPA is subject to FERC oversight and regulation pursuant to the FERC License.

15.     Pursuant to the FERC License, NYPA is also responsible for the management of historic properties within the Power Project pursuant to the Historic Properties Management Plan for the Niagara Power Project, dated August 2008 (the "HPMP").

16.     New York State Office of Parks, Recreation, and Historic Preservation ("OPRHP") is the State of New York's public park agency, established pursuant to New York Parks Recreation and Historic Preservation Law Article 14 to protect the public parks in the State for the benefit of the general public.

17.     Upon information and belief, OPRHP leases the Power Plant Site and the Park from NYPA for operation as a state park.

18.     MOTM is a New York corporation doing business in New York, and is the applicant for the Project.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction to hear this action pursuant to the federal question jurisdiction of 28 U.S.C. §1331 because plaintiff's claims arise under federal law pursuant to the APA, NEPA, NHPA, LWCF, Clean Water Act, River and Harbors Act of 1890, and the FERC License.  This Court also maintains original jurisdiction for judicial review of FERC determinations pursuant to 42 U.S.C. § 7192.

20.     The United States District Court for the District of Columbia is the proper venue for this action under 28 USC §1391(e) because Defendants all maintain principal offices within the geographic area of the District of Columbia.

**THE HISTORIC AND ENVIRONMENTAL
SIGNIFICANCE OF THE POWER PLANT SITE**

21.     The Power Plant Site is on the National Register of Historic Places and is located within both the Niagara Falls National Heritage Area and, upon information and belief, the Niagara Reservation State Park.

22.     The National Register of Historic Places is the official list of the Nation's historic places worthy of preservation.  Authorized by the National Historic Preservation Act of 1966, the NPS administers the National Register of Historic Places as part of a national program to coordinate and support public and private efforts to identify, evaluate, and protect America's historic and archeological resources.

23.     The Power Plant Site was nominated in December 2012 by OPRHP to be listed on the National Register of Historic Places.  The National Register registration application (the "Registration Application") for the Power Plant Site was approved by NPS on or about February 20, 2013.

24.     Historically, the Power Plant Site consisted of three hydroelectric powerhouses (Powerhouse 3A, 3B, and 3C) built between 1905 and 1924, two of which, 3B and 3C, collapsed into the Niagara River in an historic rockslide in 1956.

25.     Among the resources referenced in the Registration Application as contributing to the historic significance of the Power Plant Site are: the ruins of Powerhouses 3B and 3C (the "Powerhouse Ruins"), consisting of the building remnants from the collapsed Powerhouses still present in the Gorge below the former Power Station (but which are slowly disappearing due to the Project), and the tailraces and ice runs from each powerhouse; the historic collapsed rock face sections of Powerhouses 3B and 3C (the "Powerhouse Rock Face"); and the stone wall, penstocks, elevator shaft and tailraces for Powerhouse 3A.

26.     As set out in the Registration Application for the Site submitted to and accepted by the NPS, the Site is a historic treasure because of its importance to the development of utility scale hydropower in the region and the commercialization of AC power.

27.     The Site also has threatened plant species that live on the Rock Wall called Smooth cliffbrake, a New York state-listed threatened plant species, which has been identified as present in the "smooth and mortar portion of the exposed rock face zone" of the Power Plant Site.

28.     Perennial seep habitat is also present, which may support diverse plant species and provide foraging habitat for reptile and avian species.

29.     These rare plants and habitats are being adversely impacted by the construction of the Project.

30.     An environmental analysis conducted by the Coalition in February 2013 demonstrated that the Project facility location is contaminated with hazardous substances.  The

contamination (the "Contamination") includes semi-volatile organic chemical contamination exceeding state residential and commercial cleanup standards, arsenic contamination exceeding state residential and commercial cleanup standards, and lead and mercury contamination exceeding residential cleanup standards.

31.     Additionally, the tunnels and hydraulic canal at the Power Plant Site were filled with various forms of waste material after the entire Power Plant was demolished in 1962.

32.     The Project construction activities will likely create pathways for contaminated material to emanate from the Powerhouse Rock Face in the seeps and weeps.

## THE PROJECT AND ITS SIGNIFICANT IMPACTS

33.     Based on the available Project documents, MOTM is planning to construct (and has actually begun the initial phases of constructing) an industrial boat dock, crane, storage, maintenance, and refueling facility directly on top of the Powerhouse Ruins in the Park.

34.     As described in the various Project documents included in the Joint Application for Permit to the USACE (the "Joint Application"), the scope of the Project appears to include the construction of, among other things:

> a.     A paved concrete boat dock platform (the "Boat Dock Platform") in the Gorge adjacent to the Niagara River at an elevation just above the Extreme High Water mark for the Niagara River for storing two MOTM excursion boats and a seasonal floating dock during the winter.
>
> b.     A vertical 80-foot tall marine lift (the "Boat Crane") located on the Boat Platform.
>
> c.     A ramp to a lower platform (the "Lower Platform") riverward of the Boat Platform at an elevation just above the Ordinary High Water mark for the

Niagara River to provide access to the new floating boat dock (the "Floating Dock").

d. A second paved concrete platform (the "Upper Platform") connected by a ramp to the Lower Platform at an elevation about 25 feet higher than the Lower Platform.  The Upper Platform will include a new 3,500 square foot maintenance building (the "Maintenance Building") as well as storage for a work boat.  From the renderings provided, the Maintenance Building architecture appears to be consistent with a vehicle garage. A backhoe will also be stored on the Upper Platform.

e. A new elevator to be installed within the historic Elevator Shaft and a new "penthouse" to be constructed on top of the Elevator Shaft.

f. A diesel fueling system to fuel the MOTM boats as well as other utilities such as power, water, natural gas, electric, and communications equipment.  The penstocks for Powerhouse 3A will be used as a conduit for providing the utilities to the Project site.

35. The demolition work for the Project has and will continue to significantly alter the historic appearance of the Powerhouse Rock Face.

36. The excavation work has already caused the removal and disposal of some historic building remnants which OPRHP and NYPA initially stated would be preserved if found pursuant to FERC License agreements, including the Programmatic Agreement, Historic Properties Management Agreement and the Unanticipated Discoveries Plan (together the "Historic Properties Agreements").

37. NYPA has recently changed its own position in violation of the Historic

Properties Agreements, and has now irreconcilably claimed that such remnants are not historically significant and thus can be destroyed.

38.     As a result of this change of position, NYPA is actively allowing MOTM contractors to discard historically significant ruins from the Power Plant Site at this time.

39.     OPRHP's position is unclear since it has been silent in the Record since mid-May 2013 and has not formally commented on photos of ruins being actively discarded into a roll-off container.

40.     In one area, the seeps have already been destroyed by the Project construction and neither NYPA nor OPRHP have responded in the Record to the Coalition's allegations about this are of the Power Plant Site being destroyed.

41.     The Smooth cliffbrake and the remaining area of seeps in the Powerhouse Rock Face are subject to harm from the ongoing construction activities.  The rock scaling and rock removal, in conjunction with the lifting and lowering of equipment construction cranes, threaten the already threatened species at the Power Plant Site.

42.     The initial rock scaling removal work has receded the top of the Gorge and eliminated a portion of the Park where members of the Coalition formerly enjoyed a running trail.

43.     There are significantly more Powerhouse Ruins that remain on the Power Plant Site buried under the area where the Project facilities will be constructed.

44.     No plans of any kind to preserve the excavated Powerhouse Ruins appear in any of the available public records, and to the contrary, some ruins are being actively discarded into roll off containers for disposal and others are apparently being hidden in a warehouse away from public view.

45.     MOTM claimed in the original Project documents that it would be burying or "entombing" the Powerhouse Ruins, but instead has actually been excavating significant portions of the Power Plant Site where the Powerhouse Ruins are present, and subsequently releasing contaminated soil to the environment without performing soil remediation and/or proper management of the contaminated soils.

46.     The Project has also constructed support structures for a massive construction crane, believed to be as large and heavy as approximately 200 tons, to be located at the top of the Gorge (the "Construction Crane").

47.     Steel piles were driven into the top of the Gorge to support the Construction Crane (the "Crane Pad Supports"). There is no disclosure in the state environmental review documents that this work was going to be done.  This work may cause further collapse of the Power Plant Site into the Gorge because insufficient geotechnical studies of the Gorge were performed to determine if the rock on the top of the Gorge could support the weight of the Construction Crane.

### THE COALITION

48.     Members of the Coalition include residents and business owners of the City of Niagara Falls as well as nearby Niagara County residents who have a unique appreciation for the historic nature and the environmental issues associated with the Park and the Power Plant Site or have adjacent businesses directly impacted by this Project.

49.     Coalition Director Louis Ricciuti ("Ricciuti") is a life-long tourism professional, researcher and environmentalist who has been interested in the geologic, cultural, ecologic, and industrial history of Niagara Falls and the Niagara Reservation State Park from childhood.

50.     Ricciuti has hiked the Gorge and the Power Plant Site his entire life.  Ricciuti has a particular interest in the history of the Park, Power Plant Site, the historic collapse of the Schoellkopf hydropower facility, and subsequent contamination issues related to filling the hydraulic canal and tunnels with contaminated materials after the Schoellkopf Plant collapsed.

51.     Ricciuti has also been involved in numerous environmental advocacy endeavors including pushing the federal government to clean up high level radioactive materials at the Lake Ontario Ordinance Works ("LOOW") and Niagara Falls Storage Site ("NFSS") in Niagara County, as well as making the public aware of historic radiological, chemical, and metallurgical contamination in the Niagara Falls area, including the former industry that was present along the rim of this Gorge area when the original hydropower plants were present.

52.     Upon hearing of this Project, Ricciuti recommended that an environmental investigation of the Power Plant Site be conducted on behalf of the Coalition, which revealed the presence of the Contamination exceeding residential and commercial state cleanup standards.

53.     The press has independently referred to Ricciuti as a long time environmentalist.

54.     Coalition member Steven P. Fleck ("Fleck") is the President and partner/owner of Wafer Motor Lodge, Inc., which owns the Howard Johnson Closest to the Falls and Casino Hotel (the "Hotel"), located at 454 and 472 Main Street in the City of Niagara Falls, Niagara County, New York.  Fleck's business is located directly across the street from the Park and the Power Plant Site.  Fleck is greatly concerned about the lack of disclosure of the Project to adjacent property owners, and is particularly concerned about disruptions to his business and exposure to himself and Hotel employees and guests from the traffic, noise, dust, and contamination during the one and one-half year Project construction phase, and aesthetic impacts both during the construction phase, and after MOTM's industrial boat storage and refueling station is constructed

and in operation.  As with Ricciuti, Fleck has appreciated the historic aspects of the Power Plant Site.

55.     Coalition member Paul G. Poulos ("Poulos") is the owner of property located at 465 Main Street in Niagara Falls, New York and is the President and substantial owner of Star Food Mart, Inc., which operates a convenience grocery, the Star Food Mart, at this property.  The Star Food Mart is also located directly across the street from the Park and the Power Plant Site. Poulos is concerned with the disruption of his business due to the Project construction activities because of construction traffic, noise, dust, contamination, and interference with the popular Niagara Gorge Discovery Center.  Poulos has appreciated the historic aspects of the Power Plant Site and is also concerned with the aesthetic impact to the historic Power Plant Site from the Project.

56.     Coalition member Michele G. Bergevin ("Bergevin") is the owner of property located at 748 4th Street in Niagara Falls, New York and is an attorney with an office located at 650 4th Street, Niagara Falls, New York. Bergevin is also an avid runner and frequently runs past what used to be the Power Plant Site on the former Gorge rim trail. However, she can no longer do so with the demolition and construction and would have participated in any public hearings or meetings regarding the project had any been available to the public.  Bergevin, with her home and office just a block from the Site, is concerned with the Project construction activities because of construction traffic, noise, dust, and contamination.

57.     The objective of the Coalition in this matter is to preserve the historic National Register Power Plant Site, prevent collapse of the Power Plant Site, ensure the threatened plant species present at the Power Plant Site are protected, and that proper considerations are in place to manage the Contamination present at the Power Plant Site during construction of the Project.

13

## THE FEDERAL AGENCY DETERMINATIONS

**A.    The Proposed Conveyance To Allow The Project Should have been Subject To Formal FERC Authorization**

58.    The FERC License granted NYPA a license to operate and maintain the Power Project.

59.    The Project at issue in the instant matter (*i.e.*, the construction of a private industrial facility within the Niagara Falls National Heritage Area for the purpose of allowing the storage, maintenance, and refueling of privately owned tour boats for at least 30 years) is located on the lands, which are subject to the FERC License.

60.    The FERC License sets forth various conditions regarding the continued use and maintenance of Power Project lands, including FERC License Article 411 ("Article 411"), which permits NYPA to "grant permission for certain types of use and occupancy of project lands and waters and to convey certain interests in project lands and waters for certain types of use and occupancy, without prior Commission approval."

61.    The Project to construct a private commercial and industrial facility within the Niagara Falls National Heritage Area constitutes a conveyance, and thus must be consistent with the terms of the FERC License.

62.    The FERC License requires that any conveyance under Article 411 of the FERC License is permissible "only if the proposed use and occupancy is consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the [Power Project]." (emphasis added.)

63.    On February 8, 2013, NYPA filed a notice (the "Prior Notice", FERC Accession No. 20130208-5136) pursuant to Article 411 providing notice of NYPA's intent to approve the conveyance (the "Conveyance") of a land use permit by OPRHP to MOTM, which would allow

MOTM to use 2.9 acres of Power Project lands (*i.e.* the Power Plant Site) to construct the Project.

64.     The Prior Notice requested that FERC issue a letter authorizing NYPA to proceed with the Conveyance by February 22, 2013.

**B.     Plaintiff Protested FERC's Authorization of the Proposed Conveyance**

65.     On February 20, 2013, the newly formed Coalition, whose members were watching this Project unfold far too rapidly, filed a Motion to Intervene and Protest (the "Protest", FERC Accession No. 20130221-0009) NYPA's Prior Notice request.  The Protest requested that FERC deny NYPA's request and require NYPA to obtain formal FERC approval of the Conveyance.

66.     The Coalition alleged that the proposed Conveyance was not consistent with Article 411 of the FERC License because it was not "consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the [Power Project]" and that NYPA was on record stating that this was an industrial project and therefore, could not meet the recreational use criteria to avoid formal approval.

67.     The Coalition alleged only certain types of uses specified in subsections (b) and (c) of Article 411 do not require prior approval by FERC.  By contrast, for those uses specified in subsection (d) of Article 411, such as an industrial use, NYPA is required to provide notice to the Director, Office of Energy Projects of FERC (the "Director") at least 60 days prior to the conveyance, and may proceed with the conveyance "[u]nless the Director, within 45 days from the filing date requires the licensee to file an application for prior approval . . . ."

68.     Article 411(e) further imposes certain conditions on any conveyances, including but not limited to the requirement that NYPA "consult with federal and state fish and wildlife or

recreation agencies, as appropriate, and the State Historic Preservation Officer [here, OPRHP)]" and ensure that the proposed use is "not inconsistent with" the recreational plan for the Power Project.

69.     Among the issues raised in the Protest, the Coalition contended, and still contends and alleges:

a.     The Prior Notice omitted critical information necessary for FERC to determine whether the Project "is consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the project," as required under Article 411.

b.     Even the little information that was provided in the Prior Notice suggested that the Project would adversely affect Power Project lands.

c.     The proposed Conveyance did not fall within the scope of Article 411(d) of the Project License.

d.     NYPA speciously asserted that the Project is a permitted use under Article 411(d) because it is either a "private or public marina for 10 or fewer boats located at least one-half mile from any other private or public marina on project waters" and/or a "recreational development not inconsistent with the recreation management plan."   Both assertions are incorrect.   The Project bears little resemblance to a "marina" in the commonly-understood sense of the word, particularly since the public will be prohibited from using it even though it is in a public park.   The purpose of the dock is solely for commercial use by MOTM's boats.

e. The Prior Notice itself elsewhere more accurately describes the Facility as an industrial "new winter storage, maintenance, and refueling facility," rather than a marina.  The MOTM excursion boats will be stored on a large concrete platform above the Niagara River rather than being moored on the water, as would normally be the case with a marina.

f. The Facility also cannot be classified as a "recreational development" under Article 411(d)(6) of the Project License.  Only small parts of the Project facilities, if any, may be used by recreationists.  The public, including members of the Coalition, will not be able to use the so-called marina nor will the public be able to pull its boats out of the water in the winter via the new Boat Dock.

g. The Project is almost entirely, if not entirely a private industrial dry dock, providing private boat storage, maintenance, and refueling for a private corporation, yet located on public park land on a National Register site, which should have been subject to the full FERC License approval process.

h. The Contamination present at the Power Plant Site was above state unrestricted use and commercial standards, and once disturbed should have been remediated and properly handled.

## C. FERC Improperly Authorized the Conveyance

70. On March 8, 2013, FERC improperly authorized the Prior Notice request (the "FERC Authorization", FERC Accession No. 20130308-3000), allowing NYPA to grant the Conveyance without formal approval from FERC.

71.     While the FERC Authorization merely stated to NYPA "that you have the continuing responsibility to supervise and control the proposed use to ensure compliance with the applicable provisions of [Article 411] and approved HPMP," the FERC Authorization completely failed to address in any way whatsoever the issues raised by the Coalition in the Protest.

72.     Even though FERC has been put on notice that NYPA has been violating its obligations under the HPMP, it still has not withdrawn its FERC Authorization, which is apparently the agency's final determination, and it has not taken any other action to require compliance with all of the terms of its Authorization.

73.     The FERC Authorization contained no independent assessment of the intended industrial use of the National Register Power Plant Site, and makes no reference to making consultations with other federal or state agencies in making the determination in the FERC Authorization.

**D.      The FERC Authorization Violated NEPA**

74.     In addition to violating the FERC License, as discussed above, the FERC Authorization was issued in violation of NEPA.

75.     FERC made no mention of a NEPA determination, much less any NEPA analysis, in the FERC Authorization.

76.     Upon information and belief, FERC did not conduct a NEPA-compliant environmental analysis prior to issuing the FERC Authorization because, among other things, an alternatives analysis was not performed.  Most notably, no other sites were analyzed along the entire New York shoreline to determine if any other site other than the historic National Register Power Plant Site could accommodate this Project.

**E.     The FERC Authorization Violated the LWCF**

77.     Because a portion of the Park was being privatized for 30 years, and neither NYPA nor MOTM had obtained the requisite approval from the Secretary of the Interior, the Conveyance was the unlawful conversion (the "Conversion") of federally-funded parkland in violation of the LWCF.

78.     FERC thus unlawfully authorized the Conversion of the Park through the FERC Authorization.

79.     Upon information and belief, either FERC illegally authorized the Conversion without consulting NPS, or NPS illegally permitted FERC to authorize the Conversion by failing to "assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location" as required by the LWCF.  16 U.S.C. § 460l-8(f)(3).

**F.     Plaintiff filed a Request for Reconsideration of the FERC Authorization**

80.     On March 28, 2013, the Coalition filed a Request for Reconsideration of the FERC Authorization (the "Reconsideration Request", FERC Accession No. 20130329-0004).

81.     In addition to the issues raised in the Protest, the Reconsideration Request also noted that the FERC Authorization did not comply with NEPA and also raised previously undisclosed information that federal funding for the Niagara Gorge Hiking Trail, the land along the Gorge rim and the area where Project facility will be located, had been obtained through the LWCF.

82.     The Reconsideration Request also noted that NYPA had not complied with its obligations under the HPMP.  In particular, the Prior Notice only concludes that "there is no possibility of affecting prehistoric or Native American artifacts," but makes no findings

whatsoever with respect to the historic Power Plant Site.  Instead, the Prior Notice only makes the vague assertion that NYPA "will" consult with [OPRHP] "per Section 14.09 . . . or Section 106."

83.     There is also nothing in the Authorization indicating that NYPA or MOTM considered any alternatives to avoid or mitigate harm to the historic resources, as required under the HPMP.

84.     FERC granted a rehearing for consideration of the Coalition's Reconsideration Request on April 29, 2013 (FERC Accession No. 20130429-3011).

85.     On May 16, 2013, the Coalition made a motion to lodge (the "Motion to Lodge", Accession No. 20130516-5135) newly received information in support of its Request for Reconsideration, including a letter (the "ACHP Letter") from the Advisory Council on Historic Preservation (the "ACHP").

86.     The ACHP is an independent Federal agency, which promotes historic preservation nationally and policies that impact historic properties, and ensures that, through the NHPA Section 106 review process, the public, Indian tribes, and State and local governments have a voice in Federal decisions that impact historic properties.

87.     The ACHP Letter indicates that NYPA and USACE had erred in finding that the Project would not have any adverse impacts on the Power Plant Site and stated that "the ACHP believes that a finding of 'Adverse Effect' would have been more appropriate in this case."  The ACHP Letter further stated that "[USACE] should have considered making a finding of Adverse Effect, and engaged the [New York State Historic Preservation Officer ("SHPO")], NYPA, and other consulting parties in consultation to develop a Memorandum of Agreement (MOA) to resolve adverse effects."

88.     FERC was thereby on notice as of May 16, 2013 that the ACHP considered the Project to have an adverse effect on the Power Plant Site, and had not yet acted on the Reconsideration Request.

**G.     FERC Delayed Issuing a Decision on Plaintiff's Request for Reconsideration**

89.     On June 12, 2013, about ten weeks after filing its Reconsideration Request and six weeks after FERC granted a rehearing, the Coalition filed a motion requesting that FERC take action on the Reconsideration Request by June 14, 2013 because of the ongoing destruction of the National Register Power Plant Site due to Project construction activities (the "Take Action Motion", FERC Accession No. 20130612-5132).

90.     In the Take Action Motion, the Coalition put FERC on notice that NYPA was permitting MOTM to violate the HPMP, and thus was in violation of the FERC License.

91.     Specifically, on June 1, 2013, historic Powerhouse Ruins were being excavated and were not being preserved, but instead were discarded into a scrap metal roll off container for off-site recycling or disposal.  These activities represent a clear breach of the Unanticipated Discoveries Plan contained in the HPMP, which requires ground-disturbing activities in the vicinity of the discovery to be stopped, the prohibition of vehicles, equipment, and unauthorized persons from traversing the discovery site, arranging for a qualified professional archaeologist to evaluate the discovery, and implementing the appropriate treatment measure(s) utilizing professionals and before construction proceeds.

92.     NYPA filed a response ("NYPA's Response") to the Coalition's allegations regarding its breach of the HPMP contained in the Take Action Motion on June 27, 2013. NYPA's Response did not address FERC's failure to comply with NEPA, the LWCF, the

improper Conveyance, and other violations of the NHPA set forth in the Protest and Reconsideration Request.

93.    Upon receiving no response from FERC regarding the Take Action Motion, the Coalition filed second Request for Immediate Action with FERC on July 2, 2013 regarding the breach of the HPMP, and, deeming the Reconsideration Request futile, initiated the instant action, which will also seek emergency injunctive relief, because of the irreparable harm to the National Register Power Plant Site continuing to be caused by the ongoing construction of the Project.

94.    Because of the irreparable harm being caused to the National Register Power Plant Site, the FERC Authorization represents final agency action.

95.    Since members of the Coalition are being actively damaged, the Coalition would be left without a legal remedy if the imminent irreparable harm were allowed to continue to occur while waiting for FERC to act again.

96.    Therefore, the Coalition has commenced this federal court action seeking injunctive relief to compel the Federal Agencies involved in this matter to comply with federal law.

## H.    The Army Corps of Engineers Permits

97.    The Project includes the installation of docks along the Niagara River.  This includes a Boat Dock Platform filled to an elevation allegedly just above the Extreme High Water mark for the River (about 25 feet above the ordinary high water level) and a Lower Platform at an elevation just above the Ordinary High Water mark for the River to provide access to the new floating boat dock (the "Floating Dock") to extend into the River.

98.    The Floating Dock consists of a floating dock terminus of about 1200 square feet

in area and seasonal floating dock of about 168 square feet in area.

99.     The Project requires dredging and filling in the Niagara River to accommodate the Floating Dock and Lower Platform, and the installation of about 250 feet of retaining wall along the River to support the Lower Platform, Boat Platform, and Boat Crane.

100.    The Project, therefore, requires permits (the "USACE Permits") pursuant to Section 404 of the Clean Water Act from the USACE for excavation and filling in a federal navigable waterway, and pursuant to Section 10 of River and Harbors Act of 1890 for the installation of structures in a federal navigable waterway.

101.    MOTM submitted the Joint Application to the Buffalo District of the USACE for the USACE Permits, among other permits, on or about January 18, 2013.

102.    The Joint Application requested that the USACE Permits be satisfied by the issuance of a Letter of Permission for the Project pursuant to Nationwide Permit ("NWP") Nos. 13 and 19, and Regional Permit ("RP") No. 87-000-1 (together the "General Permits").

103.    The General Permits were inappropriate for the USACE Permits for the Project.

104.    NWP No. 13 is for bank stabilization, which is inappropriate for the Project since the Project creates a new shoreline facility.

105.    Additionally, NWP No. 13 for the Buffalo District indicates that "every effort should be made to prevent hardening of the shoreline in New York waterbodies by selection of vegetative stabilization measures and/or rip-rap stone material, in lieu of vertical structures (i.e. wood, concrete or sheet pile bulkheads/retaining walls)." The Project does not meet this requirement because it uses retaining walls instead of non-hardened shoreline.

106.    NWP No. 19 is for dredging less than 25 cubic yards below the ordinary high water mark of the River.

107.     NWP No. 19 is inappropriate for the Project because, among other reasons, upon information and belief, more than 25 cubic yards of material were actually dredged below the ordinary high water mark of the River at the Project site.

108.     RP No. 87-000-1 is for floating docks that do not exceed 150 feet in total length and 1200 square feet of total surface area.

109.     RP No, 87-000-1 is inappropriate for the Project because, among other reasons, the Projects exceeds 150 feet in total length and 1200 square feet of total surface area.

110.     RP 87-000-1 Special Condition No. 21 requires the USACE District Engineer to "determine whether the proposed activity has the potential to cause an effect on the historic properties [at the project site]" and to consult the ACHP where an applicant intentionally and significantly affects a historic property to which the permit would relate.

111.     The MOTM construction drawings, which were part of the Joint Application, clearly showed an excavation cut in an area where Powerhouse Ruins were known to be present from the collapsed power plant because some were sticking out of the ground surface and clearly visible.

112.     Upon information and belief based on the contents of the ACHP Letter, which clearly suggests the ACHP was not notified of this Project, the USACE did not consult with the ACHP when assessing the impact of the Project on the National Register Power Plant Site.

113.     The Project plans in the Joint Application demonstrated on their face the Project would significantly impact the Power Plant Site.

114.     On February 20, 2013, the USACE issued Commencement of Consultation letters to the following agencies and entities, which indicated an intent to issue a Letter of Permission for the USACE Permits based on the General Permits: the Seneca Nation of Indians, the New

York State Department of Environmental Conservation, the U.S. Fish and Wildlife Service, the U.S. Coast Guard, the New York Department of State, OPRHP, the Tonawanda Seneca Nation, the Tuscarora Nation of New York.

115.    Upon information and belief, NPS was not consulted regarding the Joint Application as required by 33 C.F.R. § 230.25(a) and 40 C.F.R. § 1501.6.

116.    Upon information and belief, on February 20, 2013, USACE issued a finding of "No Adverse Effect" regarding the Project.

117.    In the ACHP Letter of April 29, 2013 to USACE, which was sent after the fact, the ACHP acknowledged that a "finding of 'Adverse Effect' would have been more appropriate in this case" and "[USACE] should have considered making a finding of Adverse Effect, and engaged the [New York State Historic Preservation Officer ("SHPO")], NYPA, and other consulting parties in consultation to develop a Memorandum of Agreement (MOA) to resolve adverse effects."

118.    Upon information and belief, on April 19, 2013 the USACE issued a Letter of Permission (the "LOP") with special conditions to MOTM pursuant to the General Permits allowing the Project to proceed.

119.    Upon information and belief, the USACE did not conduct a NEPA-compliant environmental analysis prior to issuing the LOP because, among other things, an analysis of reasonable alternatives was not performed.

120.    The LOP constituted final agency action.

## RELATED LITIGATION

121.    The Coalition initiated a hybrid N.Y. CPLR Article 78/declaratory action proceeding in New York State Supreme Court, Niagara County by filing a Notice of Petition and

the Petition on April 4, 2013 with the Niagara County Clerk.  The state action solely involved allegations of violations of state law.

122.    By an Order to Show Cause dated and entered April 5, 2013, the Hon. Ralph A. Boniello, J.S.C. granted the Coalition a Temporary Stay and Restraining Order ("TRO") enjoining and prohibiting MOTM from constructing any portion of the Project at the Power Plant Site until a determination was made on petitioner's application for a preliminary stay and injunction.

123.    On April 11, 2013, the Coalition's application was heard before the Hon. Catherine Nugent-Panepinto, J.S.C. who vacated the TRO and denied the application for a preliminary injunction, and, without a Motion to Dismiss or Answer submitted by respondents, denied the Petition *sua sponte*.

124.    On appeal to the Appellate Division, Fourth Judicial Department, the Coalition subsequently sought an order to show cause for a preliminary stay and injunction with a temporary stay and restraining order.

125.    On May 17, 2013, the Honorable Rose H. Sconiers denied the Coalition's request for a temporary stay and restraining order.

126.    The Coalition's motion for a preliminary injunction based on violations of state law was filed on June 10, 2013 but was denied.

### FIRST CAUSE OF ACTION
### Violation of NEPA by FERC

127.    Each and every allegation contained in the preceding paragraphs of this Complaint is incorporated herein by reference as if fully set forth herein.

128.    FERC's NEPA regulations at 18 C.F.R. § 380.4 require that, at a minimum, an environmental assessment be performed when comments on an application provided by the

public indicate that an action may be a major Federal action significantly affecting the quality of the human environment.

129.    Major Federal actions include projects, which are partly or entirely regulated by the Federal government, including projects subject to permits, and also include the circumstances where responsible officials fail to act.  40 C.F.R. § 1508.18.

130.    By putting FERC on notice of the significant adverse impacts to the National Register Power Plant Site and Park, the impacts on state-listed threatened plant species, the threatened collapse of the Power Plant Site, and the Contamination, the Coalition demonstrated that the Project is a major Federal action significantly affecting the quality of the human environment and uniquely impacting members of the Coalition.

131.    An environmental assessment within the meaning of NEPA, 40 C.F.R. §1508.9 and 18 C.F.R. § 380.2, requires FERC to discuss of the need for the Project, the alternatives to the Project considered, the environmental impacts of the proposed action and considered alternatives, and a listing of agencies and persons consulted.

132.    FERC violated NEPA by failing to complete, at a minimum, an environmental assessment in the manner provided by NEPA.  FERC failed to conduct an alternatives analysis pursuant to 40 C.F.R. §1508.9 and 18 C.F.R. 380.2 before issuing the FERC Authorization.

133.    As demonstrated by ACHP's after-the-fact letter, if the ACHP had been properly provided with the opportunity to review this Project before the Approvals were provided, it would have determined that the Project did cause "Adverse Effects".

134.    In addition, OPRHP is on record in a newspaper article from March 2012 as stating that if a dock were to be constructed in New York an environmental impact statement

(EIS) would be required and it would be close to impossible to find a site on which to construct such a facility. An EIS is even more comprehensive than an environmental assessment.

135. Because the Project represents a major federal action that adversely impacts a site of historic and cultural significance, an EIS pursuant to NEPA should have been required.

136. Yet not only has there been no evaluation of alternatives or alternative sites, there certainly was no EIS or even an environmental assessment.

137. FERC's actions in failing to comply with NEPA, and its implementing regulations, prior to issuing the FERC Authorization, which represents a final agency action, are arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 551 *et seq.*

## SECOND CAUSE OF ACTION
### Violation of NEPA by the Army Corps of Engineers

138. Each and every allegation contained in the preceding paragraphs of this Complaint is incorporated herein by reference as if fully set forth herein.

139. USACE regulations at 33 C.F.R. Part 230 and 33 C.F.R. Part 325 Appendix B provide that issuance of a permit under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, or Section 10 of the Rivers and Harbors Act ("RHA"), 33 U.S.C. § 403, constitutes a federal action subject to the requirements of NEPA.

140. USACE regulations at 33 C.F.R. §230.7 provide that the issuance of a permit requires that an environmental assessment be performed.

141. The LOP constituted the issuance of a permit. 33 C.F.R. §325.2(e)(1).

142. An environmental assessment within the meaning of NEPA, 40 C.F.R. §1508.9 and 33 C.F.R. §230.10, requires USACE to discuss of the need for the Project, the alternatives

considered to the recommended courses of action in any proposal, which involves unresolved conflicts concerning alternative uses of available resources, as required by NEPA Section102(2)(E), the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

143.    Because the Joint Application requested a Section 404 CWA permit and a River and Harbors Permit, an environmental assessment pursuant to NEPA should have been performed.

144.    USACE violated NEPA by failing to complete an environmental assessment in the manner required by NEPA and by failing to conduct an alternatives analysis pursuant to 40 C.F.R. §1508.9 and 33 C.F.R. §230.7 before issuing the LOP.

145.    If the ACHP had been properly provided with the opportunity to review this Project before the Approvals were provided, it would have determined that the Project did cause "Adverse Effects".

146.    OPRHP is on record in a newspaper article from March 2012 as stating that if a dock were to be constructed in New York an EIS would be required and it would be close to impossible to find a site on which to construct such a facility.

147.    Because the Project represents a major federal action that adversely impacts a site of historic and cultural significance, an EIS pursuant to NEPA should have been required.

148.    Yet not only has there been no evaluation of alternative sites, there certainly was no EIS nor even an environmental assessment.

149.    USACE's actions in failing to comply with NEPA, and its implementing regulations, upon issuing the LOP are arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 551 *et seq*.

### THIRD CAUSE OF ACTION
### Violation of the NHPA by FERC

150.    Each and every allegation contained in the preceding paragraphs of this Complaint is incorporated herein by reference as if fully set forth herein.

151.    NHPA Section 106 and FERC implementing regulations for the NHPA at 18 C.F.R. §380.14 require FERC to take into account the effect of a proposed project on any historic property and to afford the ACHP an opportunity to comment on projects.

152.    As the ACHP Letter shows, the ACHP determined that the Project should be considered to have an adverse impact on the Power Plant Site.

153.    The FERC License requires NYPA to supervise and control the Project to ensure compliance with the applicable provisions of Article 411 of the FERC License and the HPMP.

154.    FERC was put on notice by the Coalition that NYPA was failing to supervise and control MOTM's compliance with the HPMP during construction of the Project, but failed to ensure NYPA's compliance with the HPMP.

155.    FERC thus violated NHPA by failing to recognize that the Project would destroy a portion of the National Register Power Plant Site, failing to intervene to ensure compliance with the HPMP, and failing to obtain comments from the ACHP prior to issuing the FERC Authorization.

156.    FERC's actions in failing to comply with the NHPA, and its implementing regulations, upon issuing the FERC Authorization, which represents final agency action, are arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 551 *et seq.*

### FOURTH CAUSE OF ACTION
### Violation of the NHPA by the Army Corps of Engineers

157.    Each and every allegation contained in the preceding paragraphs of this Complaint is incorporated herein by reference as if fully set forth herein.

158.    NHPA Section 106, and USACE implementing regulations for the NHPA at 33 C.F.R. Part 325 Appendix C, require the USACE to take into account the effect of a proposed project on any historic property and to afford the ACHP an opportunity to comment on projects.

159.    The ACHP determined that the Project should have been determined to be a Project that would cause "adverse effects" on the National Register Power Plant Site.

160.    RP 87-000-1 Special Condition No. 21 requires the USACE District Engineer to "determine whether the proposed activity has the potential to cause an effect on the historic properties [at the project site]" and to consult the ACHP where an applicant intentionally and significantly affects a historic property to which the permit would relate.

161.    Upon information and belief, based on the ACHP Letter, the USACE did not consult with the ACHP when assessing the impact of the Project on the National Register Power Plant Site.

162.    The Project plans in the Joint Application showed MOTM would significantly impact the Power Plant Site.

163.    USACE violated the NHPA by failing to take into account the fact that the Project would destroy a portion of the National Register Power Plant Site and failed to obtain comments from the ACHP prior to issuing the LOP.

164.    USACE's actions in failing to comply with the NHPA, and its implementing regulations, upon issuing the LOP are arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 551 *et seq*.

**FIFTH CAUSE OF ACTION**
**Violation of the LWCF by FERC**

165.    Each and every allegation contained in the preceding paragraphs of this Complaint is incorporated herein by reference as if fully set forth herein.

166.    The LWCF at 16 U.S.C. § 460l-8(f)(3) states that, for state and local parks that have received LWCF funding, no public park shall be converted to other than public outdoor recreation uses without approval of the Secretary of the Interior, and that such approval will only be granted upon such conditions as is necessary to assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.

167.    When a recreational facility or park receives LWCF funding it is "mapped," which is commonly referred to as the "6(f) map."

168.    The 6(f) map area often "exceeds that actually receiving L&WCF assistance so as to assure the protection of a viable recreation entity."  36 C.F.R. § 59.1.

169.    Restrictions on the conversion of parkland under 16 U.S.C. §460l-8(f)(3) "are applicable to the area depicted or otherwise described on the 6(f)(3) boundary map and/or as described in other project documentation approved by the Department of the Interior."  36 C.F.R. § 59.1.

170.    Upon information and belief, the Project is within a 6(f) mapped area.

171.    Upon information and belief, between the years 2000 and 2005, $167,903.59 of LWCF funds were received by OPRHP "for renovation development of the trail system along the Niagara River Gorge to be in compliance with Land and Water Conservation Fund (LWCF) program requirements...."

172.    The trail system along the Niagara River Gorge runs directly through the Project Site.

173.    The Project, including the tour boat dock, crane and maintenance facility are all for the exclusive use of MOTM, a private for-profit corporation.

174.    FERC, thus, violated the LWCF at 16 U.S.C. § 460l-8(f)(3) by allowing NYPA to convey the Project site to MOTM for private use without the approval of the Secretary of the Interior of the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.

175.    FERC's actions in failing to comply with the LWCF upon issuing the FERC Authorization, which represents final agency action, are arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 551 *et seq*.

## SIXTH CAUSE OF ACTION
### Violation of the LWCF by the Army Corps of Engineers

176.    Each and every allegation contained in the preceding paragraphs of this Complaint is incorporated herein by reference as if fully set forth herein.

177.    The LWCF at 16 U.S.C. § 460l-8(f)(3) states that if a state and local park has received LWCF funding, unless otherwise approved by the Secretary of the Interior, no public park shall be converted to other than public outdoor recreation uses without approval of the Secretary of the Interior, and that such approval only be granted upon such conditions as is necessary to assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.

178.    When a recreational facility or park receives LWCF funding it is "mapped," which is commonly referred to as the "6(f) map."

179.    The 6(f) map area often "exceeds that actually receiving L&WCF assistance so as to assure the protection of a viable recreation entity."  36 C.F.R. § 59.1.

180.    Restrictions on the conversion of parkland under 16 U.S.C. §460l-8(f)(3) "are applicable to the area depicted or otherwise described on the 6(f)(3) boundary map and/or as described in other project documentation approved by the Department of the Interior."  36 C.F.R. § 59.1.

181.    Upon information and belief, the Project is within a 6(f) mapped area.

182.    The trail system along the Niagara River Gorge runs directly through the Project Site.

183.    Upon information and belief, between the years 2000 and 2005, $167,903.59 of LWCF funds were received by OPRHP "for renovation development of the trail system along the Niagara River Gorge to be in compliance with Land and Water Conservation Fund (LWCF) program requirements...."

184.    The Project, including the tour boat dock, crane and maintenance facility are all for the exclusive use of MOTM, a private for-profit corporation.

185.    The USACE thus violated the LWCF at 16 U.S.C. § 460l-8(f)(3) by approving the LOP to allow MOTM to construct the Project for private use without the approval of the Secretary of the Interior and the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.

186.    USACE's actions in failing to comply with the LWCF upon issuing the LOP area arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 551 *et seq*.

**SEVENTH CAUSE OFACTION**
**Violation of the LWCF by the National Park Service**

187.    Each and every allegation contained in the preceding paragraphs of this Complaint is incorporated herein by reference as if fully set forth herein.

188.    The LWCF at 16 U.S.C. § 460l-8(f)(3) states that, for state and local parks that have received LWCF funding, that, without approval of the Secretary of the Interior, no public park shall be converted to other than public outdoor recreation uses without approval of the Secretary of the Interior, and that such approval only be granted upon such conditions as is necessary to assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.

189.    When a recreational facility or park receives LWCF funding it is "mapped," which is commonly referred to as the "6(f) map."

190.    The 6(f) map area often "exceeds that actually receiving L&WCF assistance so as to assure the protection of a viable recreation entity."  36 C.F.R. § 59.1.

191.    Restrictions on the conversion of parkland under 16 U.S.C. §460l-8(f)(3) "are applicable to the area depicted or otherwise described on the 6(f)(3) boundary map and/or as described in other project documentation approved by the Department of the Interior."  36 C.F.R. § 59.1.

192.    Upon information and belief, the Project is within a 6(f) mapped area.

193.    Upon information and belief, between the years 2000 and 2005, $167,903.59 of LWCF funds were received by OPRHP "for renovation development of the trail system along the Niagara River Gorge to be in compliance with Land and Water Conservation Fund (LWCF) program requirements...."

194.    The trail system along the Niagara River Gorge runs directly through the Project Site.

195.    The Project, including the tour boat dock, crane and maintenance facility are all for the exclusive use of MOTM.

196.   Upon information and belief, NPS was put on notice of this Project by NYPA and/or ORPHP, and thus should have consulted with FERC and/or USACE regarding the Project, or was put on notice of the Project by FERC and/or USACE directly.

197.   Upon information and belief, NPS violated the LWCF at 16 U.S.C. § 460l-8(f)(3) by consenting to allow MOTM to construct the Project for private use either through the FERC Authorization or the LOP without the approval of the Secretary of the Interior of the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.

198.   NPS's actions in failing to comply with the LWCF are arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 551 *et seq.*

## EIGHTH CAUSE OFACTION
### Violation of Article 411 of the FERC License

199.   Each and every allegation contained in the preceding paragraphs of this Complaint is incorporated herein by reference as if fully set forth herein.

200.   The FERC Authorization improperly allowed NYPA to grant the Conveyance without approval from FERC even though the FERC Authorization contained no independent assessment of the intended use of the Project site, and makes no reference to making consultations with other federal or state agencies in making the determination in the FERC Authorization.

201.   FERC was on notice that the proposed Conveyance did not fall within the scope of Article 411(d) of the Project License since the Conveyance was neither a "private or public marina for 10 or fewer boats located at least one-half mile from any other private or public marina on project waters" nor a "recreational development not inconsistent with the recreation management plan."

202.    The FERC Authorization failed to address the issues raised by the Coalition in the Protest.

203.    FERC's actions in issuing the FERC Authorization without requiring compliance with Article 411 are arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 551 *et seq*.

## NINTH CAUSE OF ACTION
### Violation of the Clean Water Act and the River and Harbors Act of 1890

204.    Each and every allegation contained in the preceding paragraphs of this Complaint is incorporated herein by reference as if fully set forth herein.

205.    The General Permits were inapplicable to the USACE Permits necessary for the Project to comply with the CWA and the River and Harbors Act of 1890.

206.    NWP No. 13 is for bank stabilization, which is inappropriate for the Project since the Project creates a new shoreline facility.

207.    Additionally, NWP No. 13 for the Buffalo District indicates that "every effort should be made to prevent hardening of the shoreline in New York waterbodies by selection of vegetative stabilization measures and/or rip-rap stone material, in lieu of vertical structures (i.e. wood, concrete or sheet pile bulkheads/retaining walls)." The Project does not meet this requirement because it uses retaining walls instead of non-hardened shoreline.

208.    NWP No. 19 is for dredging less than 25 cubic yards below the ordinary high water mark of the River.  NWP No. 19 is inappropriate for the Project because, among other reasons, upon information and belief, more than 25 cubic yards of material were actually dredged below the ordinary high water mark of the River at the Project site.

209.   RP No. 87-000-1 is for floating docks that do not exceed 150 feet in total length and 1200 square feet of total surface area.  RP No, 87-000-1 is inappropriate for the Project because, among other reasons, the Projects exceeds 150 feet in total length and 1200 square feet of total surface area.

210.   RP 87-000-1 Special Condition No. 21 requires the USACE District Engineer to "determine whether the proposed activity has the potential to cause an effect on the historic properties [at the project site]" and to consult the ACHP where an applicant intentionally and significantly affects a historic property to which the permit would relate.

211.   The Project plans in the Joint Application showed MOTM would significantly impact the Power Plant Site.

212.   Upon information and belief, based on the ACHP Letter, the USACE did not consult with the ACHP when assessing the impact of the Project on the National Register Power Plant Site.

213.   USACE's actions in issuing the LOP when the General Permits were inapplicable to the Project was a violation of the CWA and the River and Harbors Act, and their implementing regulations, and therefore were arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 551 et seq., and are subject to judicial review thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff petitioner respectfully requests that this Court grant an Order and Judgment: (1) declaring that the Approvals by the Defendants were arbitrary, capricious, an abuse of discretion and/or contrary to law in violation of the APA for failure to comply with the requirements of NEPA, the NHPA, the LWCF, the FERC License, the Clean Water Act and/or

the River and Harbors Act of 1890; (2) compelling FERC and USACE to conduct a NEPA analysis consistent with statutory requirements that includes an environmental assessment with an alternatives analysis and, because the Project represents a major federal action that adversely impacts a site of historic and cultural significance, a NEPA compliant EIS; (3) declaring that the Project has resulted in an illegal federal parkland conversion, and that this Project cannot continue until and unless it complies with the requirements of the LWCF; (4) annulling the Approvals given to NYPA and MOTM by the Defendants for the Project; and (5) such further relief this court deems just, proper and equitable.

Respectfully submitted,

/s/ Amy K. Kendall
Amy K. Kendall and *Linda R. Shaw
Knauf Shaw LLP
1400 Crossroads Building
2 State Street
Rochester, NY 14614
Tel: (585) 546-8430
Email: akendall@nyenvlaw.com
DC Bar ID: 469178
Email: akendall@nyenvlaw.com
lshaw@nyenvlaw.com
*Pro hac vice application pending

Attorneys for the Niagara Preservation Coalition,
Inc.

Dated:  July 3, 2013